THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERRY BRATCHER, | ) |
| *Plaintiff*, | ) |
| | ) No. 19 C 8190 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| WALTER NICHOLSON, et al., | ) |
| *Defendant*. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Terry Bratcher's cellmate at Stateville Correctional Center repeatedly threatened to beat him, cut off his head, and gut him like a pig. For several months, Bratcher reported the threats to Defendants Warden Walter Nicholson, Major Maurice Lake, Lieutenant Stanley Jenkins, Sergeant Ralph Burkybile, Sergeant Donald Thomas, and Karen Rabideau—all prison officials. Yet, none answered Bratcher's call for help. Eventually, Bratcher's cellmate acted on those threats and attacked him while he slept, shattering his sinus cavity, breaking his nose, cutting his face, and injuring his back. Bratcher brought this action pursuant to 42 U.S.C. § 1983, arguing that the Defendants violated the Eighth Amendment by failing to protect him from his cellmate. The Defendants now move for summary judgment. (Dkts. 70, 75). For the following reasons, the motion is denied.

## BACKGROUND

**A.   The Cellmate's Threats**

Terry Bratcher is an inmate at Stateville Correctional Center within the Illinois Department of Corrections (IDOC). (Dkt. 82 ¶¶ 1, 11). He is white and identifies as Christian. (Dkts. 85, 88

1

¶¶ 7, 9). On June 11, 2018, William Parker became Bratcher's cellmate. (*Id.* at ¶ 2).[1] About one week later, Parker told Bratcher that he was Muslim and did not like Christians. (*Id.* at ¶ 7). Parker also told Bratcher "that he should cut off [his] head because he was an infidel Christian." (*Id.* at ¶ 8). Parker began making daily threats, including that he would beat Bratcher, cut off his head, and "gut [him] like a pig." (*Id.*) Parker also told Bratcher that he disliked "white guys" and believed that white people should pay reparations. (*Id.* at ¶ 9).

**B.  Bratcher's Reports**

In mid-July 2018, Bratcher told Defendant Lieutenant Stanley Jenkins about Parker's threats. (Dkt. 82 ¶ 3; Dkts. 85, 88 ¶¶ 10, 11). In response, Lieutenant Jenkins told Parker to "leave [Bratcher] alone." (Dkts. 85, 88 ¶ 11). After Bratcher reported Parker's threats to Jenkins, Parker called Bratcher a "snitch," and taunted him: "snitches get stitches." (*Id.* at ¶ 12). The next day after reporting to Lieutenant Jenkins, Bratcher told Defendant Sergeant Donald Thomas about the threat that Parker made because he complained about him. Thomas said he would talk to Parker. (Dkt. 82 ¶ 6; Dkts. 85, 88 ¶ 13).[2] The next month, in early August, Parker slapped Bratcher in the face. (Dkts. 85, 88 ¶ 14). Bratcher again reported Parker's threats to Lieutenant Jenkins. (*Id.*) Lieutenant Jenkins told Bratcher that he had already told Parker to leave him alone, that Stateville "is not the Ritz," and that Bratcher should "suck it up . . . and deal with this guy." (*Id.*)

After the slap, Bratcher asked a correctional officer "for a request to go to protective custody," and learned that protective custody "was full," so he could only be moved "to a different cell in the [same] cell house." (*Id.* at ¶ 15; Dkt. 71-1 at 12). Bratcher had experience with this procedure in the past. Bratcher had earlier requested protective custody in April 2018 when other

---

[1] Defendant Rabideau testified that Sergeant Kenyon Bailey transferred Parker into Bratcher's cell, although Sergeant Bailey denied having done so. (*Id.* at ¶¶ 3–6).
[2] Sergeant Thomas claims he does not remember speaking with Bratcher about Parker. (Dkt. 82 ¶ 65).

inmates had been extorting him for money. (Dkt. 82 ¶¶ 13–16). IDOC approved Bratcher's April 2018 protective-custody request. (*Id.* at ¶ 18). After Bratcher signed himself out of protective custody, he was placed in a different cell house from the inmates who had extorted him. (*Id.* ¶¶ 19–21).

Bratcher did not want to go into protective custody, where prisoners are "locked in a cell just about 24 hours a day," without movement or the ability to attend church, school, or the dining hall. (Dkt. 82 ¶ 30; Dkt. 71-1 at 42). Nor did Bratcher file an emergency grievance despite his understanding that an emergency grievance would receive a response from the Warden's office within three days. (Dkt. 82 ¶¶ 32–33).

Over the next six weeks, Bratcher began a "letter writing campaign." (Dkts. 85, 88 ¶ 17). On August 14, 2018, Bratcher wrote and mailed his first of three letters to Defendant Karen Rabideau in the placement office—who he believed had authority to move inmates—asking for a cell transfer because of Parker's threats and because he feared for his safety. (Dkt. 82 ¶ 34; Dkts. 85, 88 ¶¶ 18–19; Dkt. 1-1 at 1). Bratcher wrote and mailed Rabideau a second, similar letter on September 15, 2018. (Dkts. 85, 88 ¶ 20; Dkt. 1-1 at 3). Bratcher's third letter to Rabideau repeated Bratcher's request for a cell transfer due to Parker's threats, complaining that "Parker's threats are becoming more hostile and frequent." (Dkts. 85, 88 ¶ 22; Dkt. 1-1 at 7).

Bratcher also wrote and mailed letters to Defendants Warden Walter Nicholson, Lieutenant Ralph Burkybile, Major Maurice Lake, and Lieutenant Jenkins. (Dkt. 82 ¶¶ 2, 4–5; Dkts. 85, 88 ¶¶ 23–24, 30, 33). Bratcher's September 10, 2018 letter to Warden Nicholson, the warden of Stateville, described Parker's "serious and constant threats," and noted that he had already reported the threats to Lieutenant Jenkins, Sergeant Thomas, and Rabideau, and had requested a cell

transfer. (Dkts. 85, 88 ¶ 23; Dkt. 1-1 at 2).³ Bratcher's September 28, 2018 letter to Lieutenant Burkybile similarly reported Parker's threats and asked Lieutenant Burkybile to move Bratcher or Parker to a different cell. (Dkts. 85, 88 ¶ 24; Dkt. 1-1 at 4). Lieutenant Burkybile received Bratcher's letter and gave it to Rabideau. (Dkts. 85, 88 ¶ 26). Discussing the letter, Rabideau told Lieutenant Burkybile that "she was aware of the letters and Mr. Bratcher's complaints." (*Id.* at ¶ 27). Lieutenant Burkybile later told Bratcher that he had received his letter and discussed it with Rabideau. (*Id.* at ¶ 28). Lieutenant Burkybile took no further action. (*Id.* at ¶ 29).

Bratcher's September 28, 2018 letter to Lieutenant Jenkins referenced his earlier verbal requests to Lieutenant Jenkins for a cell transfer because of Parker's threats. (*Id.* at ¶ 30; Dkt. 1-1 at 5).⁴ Bratcher reported Parker's threats again in his October 7, 2018 letter to Major Lake, noting that he had reported the threats to Rabideau. (Dkts. 85, 88 ¶ 33; Dkt. 1-1 at 6).⁵ Bratcher and Major Lake did not otherwise discuss Parker's threats. (Dkt. 82 ¶ 63). Bratcher believed that Lieutenant Burkybile, Lieutenant Jenkins, and Major Lake had authority to transfer inmates because he had seen lieutenants and majors do so "many times." (Dkts. 85, 88 ¶¶ 25, 31, 34).⁶ Despite Bratcher's complaints, he and Parker remained in the same cell until Parker attacked him. (Dkts. 85, 88 ¶ 35).

---

³ The parties dispute whether Warden Nicholson received the letter. (Dkt. 82 ¶¶ 46–48). Warden Nicholson claims his secretaries would have forwarded Bratcher's letter to the placement office if he had received it. (*Id.* at ¶ 48).
⁴ Bratcher testified that after Lieutenant Jenkins received his letter, the lieutenant asked Bratcher to stop sending him mail and talk to him in person instead. (Dkts. 85, 88 ¶ 32). Bratcher also testified that Lieutenant Jenkins said he had not acted on their earlier conversations and that he and Parker should "straighten [their problem] out" themselves. (*Id.*). By contrast, Lieutenant Jenkins claims he does not remember receiving the letter or speaking with Bratcher about Parker but would have forwarded any such complaints to Rabideau. (Dkt. 82 ¶¶ 56–58).
⁵ Major Lake claims he does not remember receiving Bratcher's letter but would have forwarded it to Rabideau if he received it. (Dkt. 82 ¶¶ 61–62).
⁶ Although Defendants do not dispute Bratcher's understanding, they dispute that Lieutenant Burkybile, Lieutenant Jenkins, and Major Lake had authority to transfer inmates in fact. (*Id.*; Dkt. 82 ¶¶ 38–40). Bratcher did not write a letter to Sergeant Thomas because he believed he lacked authority to move inmates and "would just go to Lieutenant Jenkins anyway." (Dkt. 82 ¶ 64; Dkt. 71-1 at 27).

4

C.  **The Attack**

On October 25, 2018, Parker attacked Bratcher while he slept. (Dkt. 82 ¶ 11; Dkts. 85, 88 ¶ 36). That day, a lieutenant found Bratcher "lying in a pool of blood on the floor of his cell" and "bleeding from his face." (Dkts. 85, 88 ¶ 37). Bratcher's injuries from the attack included "a shattered sinus cavity, a broken nose in two places, serious cuts on the inside of his mouth requiring stitches, scrapes across his face, and injuries to his back." (*Id.* at ¶ 38). Since the attack, Bratcher has "lost his sense of smell" and continues to experience back pain and numbness in his lower body. (*Id.*)

D.  **Procedural History**

Shortly after the attack, Bratcher filed two grievances on November 18, 2018. (Dkt. 82 ¶ 75). Although Bratcher knew the Defendants' names when he filed the grievances, neither grievance included the names. Both grievances detailed the injuries he received from Parker's attack on October 25, 2018. (Dkts. 71-3, 71-4). In his second grievance, Bratcher stated that he intended to file a "Section 1983 lawsuit for . . . lack of staff intervention," and that he had "asked placement to move [him] 3 times by letter." (Dkt. 71-4 at 2). After appealing his first grievance to the Administrative Review Board, (Dkt. 82 ¶ 78), and not receiving any relief, Bratcher filed this lawsuit on December 13, 2019, (Dkt.1). Bratcher's sole remaining claim alleges an Eighth Amendment violation pursuant to 42 U.S.C. § 1983. (Dkt. 6). The Defendants now move for summary judgment on Bratcher's claim. (Dkts. 73, 75).

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there is "sufficient evidence favoring the

5

nonmoving party for a jury to return a verdict for that party." *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). At this stage, the Court "draw[s] reasonable inferences and interpret[s] the facts in the light most favorable to the nonmovant." *Moran v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022) (quoting *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022)). Yet, the Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

## DISCUSSION

Bratcher claims that the Defendants violated the Eighth Amendment by failing to protect him from his cellmate's vicious attack. (Dkt. 1 at 8). The Defendants argue for summary judgment on three grounds: (1) Bratcher failed to exhaust administrative remedies with respect to his claim against the Correctional Officers; (2) the Correctional Officers were unaware of the risk to Bratcher's safety; and (3) the Defendants acted reasonably, including because Bratcher failed to request protective custody or file an emergency grievance. (Dkt. 73).[7]

### I. Administrative Exhaustion

Before filing a federal lawsuit, prisoners must exhaust available administrative remedies. *Miles v. Anton*, 42 F.4th 777, 780 (7th Cir. 2022); 42 U.S.C. § 1997e(a). The requirement is mandatory: "a court may not excuse a failure to exhaust." *Ross v. Blake*, 578 U.S. 632, 639 (2016). Grievances "[allow prisons] to address [issues] before being subjected to suit, [reduce] litigation to the extent complaints are satisfactorily resolved, and [improve] litigation that does occur by

---

[7] Defendants Warden Nicholson, Major Lake, Lieutenant Jenkins, Lieutenant Burkybile, and Sergeant Thomas ("Correctional Officers") move for summary judgment on all three grounds. (Dkt. 73). Defendant Rabideau, who works in the prison's placement office, joins only in the argument that Bratcher failed to seek protective custody or file an emergency grievance. (Dkt. 75).

leading to the preparation of a useful record." *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011) (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)); *see also Lockett v. Bonson*, 937 F.3d 1016, 1027 (7th Cir. 2019) ("[T]he primary purpose of the exhaustion doctrine [is to] alert[] the prison officials to the existence of the problem and afford[] an opportunity to repair the injury."). Giving "early notice to those who might later be sued" is not a leading purpose for exhaustion. *Maddox*, 655 F.3d at 722 (citing *Jones*, 549 U.S. at 219). The exhaustion requirement, although strict, "is an affirmative defense, which the defendants bear the burden of proving." *Wallace v. Baldwin*, 55 F.4th 535, 544 (7th Cir. 2022) (quoting *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011)).

"To exhaust available remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). An IDOC inmate must follow the grievance process that Illinois law sets out in 20 Ill. Admin. Code §§ 504.800 *et seq.* *See Maddox*, 655 F.3d at 721 (citing *Jones*, 549 U.S. at 218). The Code requires grievances to "contain factual details regarding each aspect of the [inmate's] complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint." 20 Ill. Admin. Code § 504.810(c). When an inmate does not know the identities of those involved in the complaint, he "must include as much descriptive information about the individual[s] as possible." *Id.*

Section 504.810(c) aims "to put prison officials on notice of an issue at the prison." *Saffold v. Ill. Dep't of Corr.*, 2021 WL 4477930, at *7 (N.D. Ill. Sept. 30, 2021) (quoting *Donald v. Varga*, 2019 WL 2525856, at *5 (N.D. Ill. June 19, 2019)). At minimum, then, a grievance must provide enough information to identify the actors involved. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014) (plaintiff's grievance contained a "fatal defect" where it "neither mentioned [the

7

defendant] by name nor provided information that should have identified him"); *Barrow v. Wexford Health Sources, Inc.*, 793 F. App'x 420, 423 (7th Cir. 2019) (plaintiff failed to exhaust where his grievances did not identify the defendant or his conduct); *see also Bowers v. Dart*, 1 F.4th 513, 517–18 (7th Cir. 2021) (plaintiff did not exhaust his claim that prison employees failed to prevent other prisoners from attacking him where his grievance contained the "substantively distinct" complaint that the correctional officer on duty "ignored him *during* the attack"). Yet, a "failure to include named defendants in a grievance is 'a mere technical defect' where the inmate sufficiently describes the alleged wrongdoing to allow prison officials a fair opportunity to respond." *Saffold*, 2021 WL 4477930, at *7 (quoting *Donald*, 2019 WL 2525856, at *5); *Maddox*, 655 F.3d at 722 (explaining that the omission of the defendants' names in the plaintiff's grievance "was a mere technical defect that had no effect on the process and didn't limit the usefulness of the exhaustion requirement").

Although Bratcher knew the Correctional Officers' names when he filed two grievances on November 18, 2018, he did not include the names in either grievance. The Correctional Officers argue this omission is "fatal." (Dkt. 73 at 3–5). But Bratcher's grievances both detailed the injuries he received from his cellmate's attack on October 25, 2018—unmistakably referring to the event that is central to Bratcher's Eighth Amendment claim. Bratcher's second grievance stated that he intended to file a "Section 1983 lawsuit for . . . lack of staff intervention," and that he had "asked placement to move [him] 3 times by letter." (Dkt. 71-4 at 2). These grievances, unlike those in *Roberts* and *Barrow*, provided detail allowing prison officials to identify the conduct at issue and determine which staff members allegedly failed to protect Bratcher from his cellmate. *Cf. Roberts*, 745 F.3d at 234; *Barrow*, 793 F. App'x at 423. *Bowers* is also distinguishable: Bratcher's second

8

grievance complained that staff failed to intervene despite his requests for a cell transfer, which is the same conduct Bratcher now challenges in federal court. *Cf. Bowers*, 1 F.4th at 517–18.

The Correctional Officers suggest that Bratcher failed to identify their conduct because there were "hundreds of security staff" on duty in the months leading up to the attack. (Dkt. 84 at 12). Yet, the total number of security staff at Stateville is immaterial. It is also a factual assertion without evidentiary support on the record. (*See generally* Dkt. 82). Leading up to the attack, Bratcher complained to each of the Defendants about his cellmate's threats, verbally or through letters. Since the Correctional Officers have the burden to show a failure to exhaust, they cannot win the day by disputing whether Warden Nicholson, Lieutenant Jenkins, Major Lake, and Sergeant Thomas read Bratcher's letters or recall speaking with Bratcher about his cellmate's threats. Normally in cases like this, defendants claim that they are unaware of the specific threat to an inmate, *see, e.g.*, *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015); but here, Bratcher remained in the same cell with the same cellmate during the entire time that he was writing and notifying jail authorities that he was in fear of that cellmate. There can be no dispute as to who the inmate feared. By sending the letters and repeatedly informing the officers that he was afraid of his cellmate, he put the Defendants on notice that he was at risk of harm. It is undisputed that Lieutenant Burkybile received Bratcher's letter.

Construing the facts and drawing inferences in Bratcher's favor, his efforts to report Parker's threats to the Correctional Officers bolster the conclusion that he exhausted available remedies. Indeed, Bratcher provided enough information in the aggregate to alert prison officials to the Correctional Officers' alleged failure to protect him from his cellmate. By omitting the Correctional Officers' names, Bratcher's grievance failed to give the Correctional Officers "early notice" of the lawsuit. *Maddox*, 655 F.3d at 722. But the Court does not fault him for the "mere

technical defect." *Id.* Rather, the grievances "served [their] function by providing prison officials a fair opportunity to address [Bratcher's] complaint." *Id.* Accordingly, the Correctional Officers have not shown that Bratcher failed to exhaust his claim, and the Court turns next to the merits.

## II. Failure to Protect

The Eighth Amendment prohibits "cruel and unusual punishments." *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018) (quoting U.S. Const. amend. VIII). Thus, prison officials must "take reasonable measures" to keep inmates safe, including by "protect[ing] prisoners from violence at the hands of other prisoners." *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020) (quoting *Sinn*, 911 F.3d at 419, and citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). A prison official violates the Eighth Amendment through deliberate indifference "to an excessive risk to the prisoner's health or safety." *Id.* To establish deliberate indifference, a prisoner must show: (1) exposure to an objectively serious harm; and (2) the prison official's actual, subjective knowledge of the risk of that harm. *Id.* (citing *Sinn*, 911 F.3d at 419). The Defendants challenge Bratcher's claim on the second prong, under which an official "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists," and "draw that inference." *Id.* (quoting *Gevas*, 798 F.3d at 480). The Defendants also argue that they responded reasonably to Bratcher's complaints and that Bratcher failed to file an emergency grievance or request protective custody. (Dkt. 73 at 6–13; Dkt. 75).

### A. Actual Knowledge

A prison official's "knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *LaBrec*, 948 F.3d at 841 (quoting *Farmer*, 511 U.S. at 842). In a failure-to-protect case, "[a] prisoner normally proves actual knowledge of impending harm by showing that he complained to prison

10

officials about a specific threat to his safety." *Gevas*, 798 F.3d at 480 (quoting *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996)). For example, "a complaint that identifies a specific, credible, and imminent risk of harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Id.* at 481 (citing *Haley v. Gross*, 86 F.3d 630, 643 (7th Cir. 1996)).

In *Gevas*, the plaintiff's "re-typed copies of notes he had handed or mailed to [prison] officials," explaining that his cellmate "had accused him of snitching on his prior cellmate" and "threatened to stab him," were sufficient to support a finding of the officials' actual knowledge and survive summary judgment. *Id.* at 481. The plaintiff's verbal complaint to another official that "his cellmate was threatening to stab him" was also sufficient to support a jury finding that the official knew about the threat. *Id.* at 481–82; *see also Haley*, 86 F.3d at 642 (holding that an inmate's statements to a prison official that his cellmate "was intimidating him and moving his things around, and . . . was crazy" gave sufficient support to a jury finding that the official had actual knowledge of a specific risk to the prisoner's safety).

Here, Bratcher complained about Parker's threats to attack or kill him—verbally or through letters—to each of the Defendants. Bratcher's evidence of these complaints is sufficient to support a finding that the Correctional Officers had actual knowledge of the serious risk of harm that Bratcher faced. *See Gevas*, 798 F.3d at 481–82. The Correctional Officers dispute whether Warden Nicholson, Lieutenant Jenkins, Major Lake, and Sergeant Thomas read Bratcher's letters or recall speaking with Bratcher about his cellmate's threats. But the Defendants cannot win summary judgment on a swearing contest. *See Stewart*, 14 F.4th at 760.

Warden Nicholson and Major Lake rely on *Knox v. Wainscott* and *Gray v. Taylor* for the position that a prisoner's "letters to I.D.O.C. administrators [are] insufficient to implicate them in

11

the alleged violations." *Knox v. Wainscott*, 2003 WL 21148973, at *10–11 (N.D. Ill. May 14, 2003); *Gray v. Taylor*, 714 F. Supp. 2d 903, 911 (N.D. Ill. 2010) ("I.D.O.C. administrators cannot be expected to involve themselves with the minutiae of daily events in the lives of thousands of prisoners." (quoting *Knox*, 2003 WL 21148973, at *11)). Yet, the *Knox* and *Gray* plaintiffs' letters were to the IDOC director and ARB officials—not to a warden or major of one prison. *See Johnson v. Obaisi*, 2019 WL 4749993, at *4 (N.D. Ill. Sept. 30, 2019) (distinguishing administrators of the IDOC, who "oversee all adult state prisons in Illinois," from administrators of a specific prison).

Moreover, a prisoner's letter to a prison administrator can establish liability if the letter alerted the administrator to "an excessive risk to inmate health or safety." *Thomas v. Knight*, 196 F. App'x 424, 428 (7th Cir. 2006) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006), and *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999)) (noting "a letter to a warden may provide a level of knowledge that would require him to take action"); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (holding a prisoner's letters to the prison superintendent could support a finding that the superintendent had knowledge of a constitutional violation); *cf. Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (ruling an inmate's letter to the warden did not provide "any detail to permit the conclusion that the letter sufficiently advised the warden of the situation to require her intervention"). Certainly, Bratcher's letters to Warden Nicholson and Major Lake described Parker's threats with sufficient detail to create a triable issue of fact as to whether Warden Nicholson and Major Lake had knowledge of an excessive risk to Bratcher's safety.

**B.     Reasonable Response**

A prison official with knowledge that a prisoner faces a substantial risk of harm may nonetheless "escape liability if they responded reasonably to the risk"—even if the harm still occurred. *LaBrec*, 948 F.3d at 841 (quoting *Farmer*, 511 U.S. at 844–45). Naturally, "as the

12

vagueness of a threat increases, . . . the official's ability to respond" decreases. *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). "The ultimate measure of the adequacy of the response is therefore reasonableness in light of the surrounding circumstances." *Id.*

### 1.     Lack of Authority and Forwarding

First, the Correctional Officers argue that only Rabideau had the authority to transfer Bratcher to a different cell. (Dkt. 73 at 9).[8] While it is undisputed that Rabideau had such authority, whether the remaining Correctional Officers also had authority to transfer inmates is a material disputed fact. Specifically, Bratcher's letter to Warden Nicholson requesting a cell transfer suggested Bratcher's understanding that Warden Nicholson had such authority. Bratcher also testified that he believed Major Lake and Lieutenants Burkybile and Jenkins had authority to transfer inmates, and he had seen lieutenants and majors move inmates. Further, Rabideau testified that a sergeant had transferred Parker into Bratcher's cell. This evidence could support a jury finding that the Correctional Officers had authority to transfer inmates.

Second, since the Correctional Officers' authority to transfer inmates is disputed, their further contention that they acted reasonably by referring or forwarding Bratcher's complaints to Rabideau is not compelling. (*See* Dkt. 73 at 11–12). True, "[p]ublic officials do not have a free-floating obligation to put things to rights," and prisoners cannot "insist that one employee do another's job." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (holding that an inmate complaint examiner who directed the prison's medical unit to treat the plaintiff was not liable for the medical unit's inaction); *see also Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir. 2017) (granting summary judgment where the plaintiff offered "no evidence or argument indicating that [the defendant] had any input into the" plaintiff's improper classification as a parolee).

---

[8] Defendants rely on inapposite cases in which prison officials lacked or reasonably exercised authority to provide medical care. (Dkt. 73 at 10–11).

13

But the Correctional Officers provide no support for the position that if the Correctional Officers had authority to transfer Bratcher to a different cell, they responded reasonably as a matter of law by passing the letter to Rabideau and doing nothing further. *Cf. Haley*, 86 F.3d at 643 (ruling that prison officials were deliberately indifferent in "ma[king] no attempt to get either of the inmates moved or" investigating further); *see also, e.g.*, *Reed v. Kirk*, 2016 WL 3476659, at *9 (N.D. Ill. June 27, 2016) ("[T]he Court knows of no authority for the proposition that a defendant who is aware of a substantial risk to an inmate's safety need not act if she knows that another with as much (or even more) authority to act upon the danger possesses the same knowledge."). Moreover, apart from Lieutenant Burkybile, it remains in dispute whether any of the Correctional Officers received Bratcher's letters—let alone forwarded the letters.

Third, despite the Correctional Officers' assertion to the contrary, the record includes evidence of inaction that goes beyond mere "laziness" or "inappropriate comments." (Dkt. 73 at 12–13). The Correctional Officers read isolated language in a lone district-court decision as requiring Bratcher to prove that "Defendants actually wanted him to suffer." (*Id.* at 13 (citing *Moore v. Hughes*, 2017 WL 1233855 (S.D. Ill. Apr. 4, 2017)).[9] That is not the standard. *See Farmer*, 511 U.S. at 842 ("[A]n Eighth Amendment claimant need not show that the official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm"); *e.g.*, *Gevas*, 798 F.3d at 484.

There is evidence on the record sufficient to support a jury finding that the Correctional Officers failed to act despite knowledge that Parker's threats presented a real risk of serious harm

---

[9] In *Moore*, a conditions-of-confinement case involving dirty walls and broken plumbing in a segregation cell, the court found that the plaintiff's own admissions defendants were merely "lazy"—together with evidence that the plaintiff received medical care for his rash—suggested that the defendants were not deliberately indifferent to the plaintiff's needs. 2017 WL 1233855 at *5.

14

to Bratcher. *See Farmer*, 511 U.S. at 842. No more is necessary to survive summary judgment with respect to the Defendants' subjective intent in failing to protect Bratcher. The Correctional Officers therefore miss the point in arguing that Lieutenant Jenkins's remark distinguishing Stateville from the Ritz "is not actionable." (*See* Dkt. 73 at 13–14). Indeed, it is the Correctional Officers' inaction that is actionable.

### 2. Obligation to Request Protective Custody or File an Emergency Grievance

All the Defendants, including Rabideau, argue that Bratcher should have sought protective custody or filed an emergency grievance before Parker attacked him. (Dkt. 73 at 14–16). The Defendants misplace their reliance on *Dale*, in which the plaintiff's "vague statements that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the [defendant] officers to the fact that there was a true threat at play." *Dale*, 548 F.3d at 569. After stressing that "[e]ach case must be examined individually, with particular focus on what the officer knew and how he responded," the Seventh Circuit held that the defendants responded reasonably to the plaintiff's vague complaints by listening when he "expressed fear for his safety," asking for details, and "offer[ing] to start a protective custody investigation." *Id.* at 570. Notably, the plaintiff in *Dale* did not himself request protective custody. *See id.* Although the *Dale* Court could not "emphasize enough the prisoner's responsibility to furnish information in these situations," the decision does not require prisoners to request a particular remedy—as the Defendants argue here. *See id.* at 570; *cf. Gevas*, 798 F.3d at 484 (holding that a prisoner had no obligation "to commit a disciplinary infraction in pursuit of his own safety").

Bratcher's situation is quite different. He alerted the Defendants specifically to Parker's threats, and these threats were concrete and were made by his cellmate who he identified repeatedly. The Defendants—not Bratcher—had a responsibility to take reasonable action. *See*

15

*Gevas*, 798 F.3d at 484 ("[O]nce the defendants were made aware that [the plaintiff's cellmate] was threatening [the plaintiff], it was their obligation as prison officials to assess the reported danger and to take reasonable steps to address it"). Unlike in *Dale*, Bratcher did not refuse an offer by the Defendants to begin a protective-custody investigation. *See Dale*, 548 F.3d at 570. Whether Bratcher enjoyed protective custody is immaterial. Of course, "[p]rison officials do not violate the Eighth Amendment because the mode of protection they offer does not sit well with a prison." *Id.* But here, the Defendants offered no protection at all. Bratcher's awareness of protective custody and emergency grievances did not require him to request those procedures. His failure to do so does not forfeit his Eighth Amendment claim.

In sum, whether the Correctional Officers had actual knowledge of Parker's threats or had authority to transfer inmates are material disputed facts. Further, the Defendants misconstrue the law in arguing that Bratcher had an affirmative obligation—after reporting his cellmate's threats—to request protective custody or file an emergency grievance. Accordingly, the Defendants have not shown that the undisputed material facts warrant judgment as a matter of law.

## **CONCLUSION**

For the reasons above, the Defendants' motion for summary judgment [70, 75] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: March 16, 2023